Please call, go ahead. Sorry, 19-3230 Lucinda Beadle v. City of Omaha et al. Okay, Mr. Jordy, please proceed. Your Honors, Ryan Jordy on behalf of Appellate Lucinda Beadle. On February 23rd, 2015, a former Omaha Police Department officer Alvin Lugod shot and killed Daniel Elrod by shooting him three times in the back. He did so when Mr. Elrod was unarmed, his hands were plainly visible, and had no weapon of any kind. Whether a seizure occurred here is not an issue. The inquiry is whether or not the seizure by deadly force was objectively reasonable. We're here based on a dismissal at summary judgment and the question turns on whether or not a jury could conclude that Elrod did not pose an immediate threat of imminent danger. Again, this is a question for the jury, and the answer to that question, we believe, is in fact no. Deadly force was not objectively reasonable, and the test for reasonableness under the Fourth Amendment requires careful attention to the facts, so let us talk about the facts. The facts existing at the moment Lugod decided to fire his weapon in objective evidence that a jury could conclude shows that Mr. Elrod was not an imminent threat of immediate danger to anyone on the scene. Well, counsel, if you look at the video, he is always reaching all down here like he's trying to find something, and sometimes it's really quick, too, that he reaches like this and like this. Pardon my bad acting, but you've seen the video. It speaks for itself. How do you reply to that? I think that's your toughest obstacle. Well, okay, I reply to that, number one, by the officers on scene, the reasonable officers that did not fire, that saw the exact same information and did not discharge their firearm. While it's true... But that's true in a way, but otherwise, I mean, there is no requirement that says all 25 officers at the scene have to fire. That's true. However, here, you cannot shoot a gun unless it's in your hand, and you first would have to get a gun in your hand. His hands were visible at all times. In fact, if you look at J48, the dashcam Exhibit 22-7, prior to being shot, his hand, his white hand, is shining against his black clothing, and the officer, Lugod, testified that he believed that there may have been a weapon in the waistband, which is under the parka. The parka is a long coat that dropped down on top of the waistband. In order to access that area, Lugod, or Elrod, would have had to use two hands, one hand to pull the coat up and another hand to access the weapon. The critical data to all sorts of crazy things beforehand, but the moment that the shots were fired, what was going on? His hands were visible. One left hand is in the air because he's going to jump over this barbed wire fence, where he would have been secured within a double barbed wire, and his right hand is also visible. At no time, immediately before the shot was fired, is he lifting up the coat, going towards something. So I agree throughout this, you know, his hands are visible. When the decision was made to shoot, there was no imminent danger of any threat of physical violence against Bonhoeff, the partner, and that's what Elrod, or pardon me, the officer, former officer Lugod, testified. He said, I wasn't concerned about myself, I was concerned about my partner, who by the way, also had his sights in the shooting position on Elrod at the same time and did not shoot. And so, at the moment the decision was made to fire, to use the deadly force, the excessive unreasonable force, the hands could be seen. If the hands could be seen, there is no gun. If there is no gun, there is no imminent danger. Mr. Elrod is 30 feet away from Bonhoeff with no weapon. Is he going to dive 30 feet at him when Bonhoeff has the gun pointed on him? Of course not. There was no imminent danger at that moment. And the video is absolutely clear, as well are the still images that are in the record that highlight it, but you can clearly pause the video and see the hands were visible, and if the hands were visible, he was not an imminent threat. And it's as simple as that, and a jury could conclude that, and we need to get to trial on that. Lugod, I'm sorry. I just want to ask about this kind of force in an unusual procedural posture, because the case was ultimately dismissed for a want of prosecution, and it's not before us on an appeal from a grant of adverse grant to summary judgment, it's not before us on a stipulated dismissal reserving the right to appeal an adverse grant of summary judgment, and we have all this weird case law out there that talks about the interlocutory rulings don't merge into a judgment when the judgment is one for want of prosecution. How would you invite us to avoid that doctrine? Even if you were to conclude it was want of prosecution, upon what claims was the want of prosecution? Because on October 31st, 2018, the dismissal, the partial summary judgment dismissal of this excessive force claim was kicked. So the only remaining claim that was dealt with in the September 2019 order that makes up the final order by having the three successive orders was the 1983 Monel claims about police custom and whether or not constitutional rights were infringed due to implementation of a police policy or custom. So let's say we're not even dealing with that. Just throw that out. We're still dealing with, and it didn't become a final order on all claims, the claims at issue here, until that final order was entered. So what were you doing during that 13-month period to pursue a remedy to force this into a posture that you could obviously have the evidence reviewing all of the thousands of pages of police policies and customs, talking to experts, concluding whether or not there was viable claims on that action. And I would submit to the court that we could have dismissed the remaining claim of there would have been a final order on dismissal, then we could have appealed as a final collective order the previously partial dismissal on excessive force. So I don't think that's of particular any moment. We still had mechanisms to get to the argument we're here today, which is the excessive force claim. So again, with respect, our position is very clear. He cannot fire a weapon that he did not have unless it's in his hands. His hands were clear. He never reaches for it. A reasonable officer like the others and a jury could conclude that Mr. Elrod did not have a weapon, was not ever going to It was actually Officer Lugod who within seconds of confronting him said, you're going to get shot. Don't make me do this. And the decedent is like, what? For what? For what? He wasn't agitated. He was confused. He was stunned. Officer Lugod said he had such good vision on him that he could see his eyeballs were dilated. This is clearly a person under those facts that could have seen white hands against black clothing illuminated by a spotlight less than 10 feet away on the side of a building and illuminated by three patrol cars, each with their headlights on the subject, while standing in an elevated position. Elrod was on stage for the world to see, and the only person that made the mistake was Lugod. No one else did, and it was unreasonable. With that, I would- Well, you used a magic word there when you say mistakes because mistakes aren't subject to 1983 liability at all. They aren't, but it's a mistake and it's an excessive use of force, so it's not mutually exclusive. It's both, because again, at the moment the shots were fired, forget what happened two, three, four minutes ago. He's holding, he's holding the whole time. Elrod's doing this, so why didn't he shoot him five minutes ago? The point- Well, they had tased him. How many minutes before the time you're- before the actual shooting, was he tased? He was tased approximately ten seconds before. He was, yeah, he was tased exactly eight seconds before the first shot. Okay, thank you. And again, your honor, when he's tased, you can see him pulling off, hands in sight, pulling off the tasers, and then he looks around and turns to go over the fence. The hands are visible because he's pulling off the tasers on his heavy parka. So again, it's a red herring because the hands are always visible. Counsel, I'm not sure that that's the relevant time period to assess whether there was an imminent threat. Isn't the relevant time period after he turns his back on the officers and starts climbing the fence? If that's the relevant, well, the relevant time period, well, he was shot before he turned because he couldn't have been shot in the back until he turned, and so when he is turned, his hands again are in the air. He's turned facing opposite. He's not, he can't do anything. He can't be a threat because he's looking the other way with his hands up. So the shot didn't occur until he turned his back on the officers and his hands were in the air. Absolutely correct. If you slow the video down and watch it, he shot three times in the back. We've got the autopsy, it's undisputed. His hands are in the air and he shot one, two, three times in the back. So this case is just, I respectfully request that if you have opportunity to look at that video again, it's in a moment of seconds, but it's clear the moment the decision was made to use excessive deadly force, this gentleman's hands were in the air and back turned. With that, I'd respectfully leave the rest of my time for rebuttal. Yes, you certainly may. Mr. Wiesen. Good morning, Your Honors. May it please the court, my name is Ryan Wiesen and I'm an Assistant City Attorney for the City of Washington. I'm here to present the defendants in this appeal. I think the initial hurdle that the appellant's face is this peculiar procedural posture. Again, the final order that the appellant is appealing from is a dismissal for failure to prosecute her case. And the appellant assigns no error to that order, makes no attempt to argue that it was improperly issued in either the appellant's opening brief or reply brief. And frankly, the the appellant spent months at the district court level failing to comply with the rules of discovery, failing to respond to discovery requests that were served upon her, failing to respond... Counselor, let me follow up on Judge Erickson's question in that regard if I could. On page two of your brief, you admit that the appellant filed a timely notice of appeal from a final appealable order. Doesn't that resolve the issue? No, it doesn't, Your Honor. Certainly, the notice of appeal that was filed was timely, but there are additional requirements that require an assignment of errors. Requirements from the Eighth Circuit that require that a party argue those errors and issues in their briefs and present relevant case law and facts to the court. And so just because they filed a timely notice of appeal within 30 days of that order, it doesn't mean that they've preserved all the issues necessary for this court to overturn Judge Smithkamp's ruling in this case. Clearly, they haven't preserved all of the issues. The one that's relevant is the excessive force claim. That's certainly what the appellant is arguing, but again, I think the court cannot overlook the appellant's failure to comply with the district court's orders in this case, which include an order to show cause as to why the case should not be dismissed. The appellant didn't file anything in response to the district court's order on that front. The appellant completely ignored that order, and I don't think it's proper for the appellant to be able to come to the Eighth Circuit months after that occurred and say, we want a second shot at this. We didn't follow the rules the first time. We didn't comply with the district court's orders, but we think you should send it back there to give us a second chance at it. I don't think the appellant has reserved or perfected that issue on appeal and certainly hasn't argued it to any extent in its briefs. And so again, I think that's fatal to the appellant's appeal in this case. With respect to the actual merits of it, though, in the qualified immunity analysis, the court has to conduct a two-step inquiry. One of those steps include an analysis of relevant case law that's sufficient to put the officer, in this case Officer Alvin Lugod, on notice that any potential conduct could be potentially in violation of the Constitution. And the appellant cites four cases in support of this proposition that there is clearly established law on these particular facts to the Eighth Circuit. And I looked through all of them. Wilson v. Lamp involves a Terry stop without any allegation of a crime or any assertion by the suspect that he has a gun. Henderson v. Munn involves the use of a sniper spray on a handcuffed suspect lying on his stomach on the ground without, again, any allegation that he is in possession of a firearm. Kolka v. Holm involves the forceful arrest of a trucker by a plainclothes officer for failing to produce his logbooks. And Bower v. Norris involves the arrest of two individuals walking on the side of the road with no allegation that they had committed any crime whatsoever or that they had any weapons of any kind. These cases can clearly be distinguished from the facts of the case that is present before the court on appeal and certainly aren't of the type that are sufficient to place Officer Lugod on notice that his conduct could be unconstitutional. And the Supreme Court has repeatedly reminded circuit courts and district courts that in the qualified immunity context, there must be sufficient case law with specific or sufficient specificity to place the officer on notice that the subject to constitutional protections. And the appellant has failed to meet his burden of providing that case law to both a district court and to this court in this case. With respect to the factual assertions and the ultimate facts that are issue in this case, the district court and this court are required to conduct a totality of the circumstance analysis and to essentially consider three factors when determining the reasonableness of Officer Lugod's use of Second, whether the suspect poses an immediate threat to the safety of officers or others. And third, whether the suspect is actively resisting arrest or attempting to flee. And I think when the court examines those particular facts of this case, all three of these factors weigh heavily in favor of Officer Lugod and the city defendants. Mr. Elrod. Counsel, do you dispute that at the time the deadly force was used that Mr. Elrod had his back to the officers, his hands were up in the air invisible, and that there was no weapon? Yes, your honor. And I think the important context is that Officer Lugod's vantage point and viewpoint was different from the other officers on scene and from the dash camera videos that are in the record. Officer Lugod is to one side of the scene and at the specific time that the forces use that the shots are fired, Mr. Elrod is agitated having just been hit with a taser. He's removed the prongs. His right hand goes down into his waistband area underneath his coat. It doesn't stay up in the air like Mr. Geordi argues. Counsel, you're confusing what happened on the hood of the car from what happened on the fence at the time the shots were fired. The appellants attempt to misconstrue the evidence in facts by arguing that Mr. Elrod had climbed up a ways and was on top of the fence. And that's just not what the evidence shows and that's not what happened. At the moment that Officer Lugod makes the decision to fire his firearm from his vantage point, Mr. Elrod is turning from his view. He's initially kind of facing him. He's turning away from him. His right hand which was underneath his coat at the time, he pulls that right hand up from beneath his coat and begins to extend it. Now hindsight, 20-20 vision tells us that he was reaching for the fence at that time. But Officer Lugod can't see that. He just knows that Mr. Elrod is reaching from a location where he has repeatedly told officers that he has a gun and he is potentially aiming that gun at other officers on scene. He's got to make a split-second decision on this. Mr. Wiesen, and pardon me, I'm not, I did look at the autopsy report and I know this is very down in the weeds but I got to ask you, do the bullets look like they came in the side? You know on the TV shows at night they talk about whether they came in the side and the angle they entered and all that kind of thing. Does the autopsy here indicate anything that or did they act like they went straight through or is that a silly question? It's not a silly question, Your Honor, but I don't know that I have a complete answer to it. I don't know that I have where the exit wounds occurred at. I do know that he was hit in the back, but again he is continuing, it's one fluid motion. He doesn't half turn and stop and then... Well is the autopsy report in this record? I don't know if it was designated as part of the record on appeal, Your Honor. Is there evidence as to the autopsy report in this record? There was at the district court level. I don't know if it is present... Well the record of appeals is a record to district court. Proceed. Counsel, how about the Yes, Your Honor, I believe he was still in that process and the shots were all in quick succession. It wasn't one shot. Counsel, what role does the video play in this? I mean you're asking me not to believe my own eyes. I've seen the video. What role does that play on appeal? I think it plays a significant role, Your Honor, because it's it's indisputable evidence, but again that video is taken from a that's a credibility determination and a factor that... Okay, can we tell from the video, because this officer is in the video right over there on the side, correct? He's visible in the video, right? At times, but at times he's not visible in the video. Yeah, okay, but when he shot he's visible, isn't he over there? Didn't my clerk show me that when they pointed to it? I don't believe he is, Your Honor. I think he was struck by a vehicle. He's, again, he's behind a separate vehicle, so there are two vehicles. There's the vehicle that Mr. Elrod is standing on, and then to what would essentially be Mr. Elrod's left, the officer's right, there's another vehicle, and so there are several officers to the right of those two vehicles, but Mr. Elrod is between the vehicle that Mr., excuse me, Mr. Officer Lugod is between the vehicle that Mr. Elrod is standing on and the building, so you can't see him in the cruiser cameras because he's obstructed by the videos. Additionally, it's a complete, it's a 90-degree angle or more difference in vantage points between the cruiser camera video that shows the incident in question and Officer Lugod's vantage point, and so again, I think it goes back to the court in the qualified immunity context is not supposed to question split-second decisions that officers have to make in quickly evolving circumstances. Again, this is an individual who said he had a gun. Mr. Jordy attempts to argue. How many times does he say, I've got a gun, I've got a gun? The officers on scene say at least two or three times, and we we can tell at least one of these times is captured on the video recording. Not all of the audio was captured for one reason or another, but Mr. Jordy argues that Mr. Elrod was stunned and was not aggravated or menacing. Well, forgive my language, but you can hear in the reporting, and the officers also stated this in their I've got a gun, motherfucker. That's not a stunned person saying that. That's threatening. That's argumentative, and again, when he pulls his hand from underneath his waistband and extends it, whether it's toward an upwards motion to grab the fence or in a motion upwards to pull a firearm and shoot another officer, Officer Lugod has to make a split-second decision at what to do, and he was in fear of the lives and the safety of the other officers on scene, and made a decision to use deadly force, and qualified immunity should protect him for that decision. I would like to address the posture of this case. It seems to be a very unusual posture that this case comes to us. I'm not sure that this is a typical qualified immunity case. As I understand it, the district court dismissed the claim because the plaintiff failed to raise a tribal fact issue on essential elements. I'm not sure that we're even in the normal qualified immunity framework. Well, Your Honor, the defendant's motion was based on qualified immunity, and so I think that the district or the appellate court, you are correct, that ultimately Judge Schmitz-Camp's order did find that Officer Lugod's force was reasonable, but I still think in order to remand the case back to the district court, the Eighth Circuit would have to determine that Officer Lugod is not entitled to qualified immunity. And again, the whole posture of this case is weird because of how it got to where we are today. This is a case, for lack of a better word, that initially started at the state court level as a state-based tort claim. It was then, there was an amending complaint filed, and a separate case was removed to federal court. The plaintiff then filed this duplicative case, and the parties agreed to dismiss the removed case from state court and proceed on the newly filed federal duplicative case. And so that's why there's a volume of evidence that's already been disclosed in precedent in this case without any of the parties actually having conducted meaningful discovery. And so it is a very odd posture, and it doesn't help the fact that, again, this case was dismissed as a sanction for failure to prosecute the case. And I think a very valid question that the circuit has to ask is what happens when the case gets returned back to the district court if the appeal is granted, if Judge Smith's order is overturned. And it was my understanding, at least at the time, that Mr. Jordy had lost contact with the actual plaintiff in this case, with the appellant. And so if it gets sent back, do we just go through the same thing where we served as the city defendants serve discovery upon the plaintiff, the plaintiff fails to respond to those discovery requests, a show cause order is entered, and it gets... I think you're in a speculation council. You have your time short, so you might address something besides speculation. That's got to be speculation, right? So let me ask this counsel. Judge, you're cross. Does it matter what happens to the other claims if you have a final order on the excessive force claim? I think it does, Your Honor, because the appellant hasn't appealed those. So any appeal to those final claims, the state law tort claims and the Minnell claims, are subject to a final appeal order that was not appealed to this court. So this court lacks jurisdiction at this point to overturn those judgments and send them back to the district court. I think that's clear, but what about the excessive force claim on which there was a final order? Are you referring to the claim in the fourth amendment to excessive force claim on which there was a final order? It was dismissed. Yes, Your Honor. I believe, again, that the plaintiff has essentially waived the ability to present that to this court by failing to prosecute her case and by failing to raise that ultimate order as an issue on the court. If this court were to determine that that waiver did not happen, I think the only issue or the only claim that this court has jurisdiction over to remand back to the district court would be the individual capacity claim asserted against Officer Lugod for a constitutional violation under the 4th and 14th Amendments. Okay, your time has expired and so we will go back to Mr. Jordy for rebuttal. Yes, thank you. The autopsy and the bullet holes directly in the middle of Mr. Elrod's back and the others are shown at joint appendix 539. Thank you. So the argument changed a little bit because on their brief at page 32 they want to argue that Elrod kept his right hand by his right hand would have been directly in the line of sight of Lugod who was no less than 10 feet directly in front of him, directly squared up with him, and he can be seen as the dark figure right behind that SUV when you look at the dash cam video which is 22-7 which is the Pope dash cam video. And so Lugod, of all people, had the best perspective to know that he wasn't an imminent threat of force. If in fact the appellees claimed they were concerned about the right hand, well the right hand would have been obscured from the other two officers that were at a 90 or 180 degree angle from Elrod at the time. And so never does at the moment of truth Elrod is not reaching in his waistband. Again, Lugod admits that the parka was zipped up and over the pants. If the gun, alleged gun, is inside the waistband, you would have to lift up the coat, go up and under, get the gun, all in this motion that never occurs. An attempt doesn't even occur. And you can clearly see that as he's got his left arm on the fence that he's trying to jump into, and so the left arm is completely out of play. Now they want you to believe with the one hand he can somehow do all of this motion to access a firearm that doesn't exist. And in any event, you can see, I've got it screenshotted right here, the white hand is almost like a flashlight. You can see all the light flashing off the white hand against the black, and this officer who fired is no more than 10 feet away right on him, and there's a spotlight on the decedent. I get all that, but I keep looking at the clearly established prong, and I keep thinking of Kruger versus Fuhrer, where the knife is 43 feet away from the guy who gets shot. Clearly the guy who got shot didn't possess it at the time he was shot, and there was no liability there. And now you're looking at this case, you've got a guy who says he has a gun, who's made some kind of fervent movements, who is going over the wall. They don't know what's behind that wall, they don't know who's there, what's there, what could happen, and how is it clearly established? Well, number one, I would respectfully dispute a portion of that, which is, I believe a reasonable jury could find that the barbed wire fence was obviously a fence to protect the property of that business, and that upon jumping into it, he was going to be within a secured... Still, still, focus counsel on the with the Billingsley case, one was an Omaha case, goodness gracious, Billingsley is an Omaha case, and the Thompson case, boy, those look awfully similar, and I think that it is on clearly established that, that, that, that, that, you, what do you respond to those two cases? Showing the law is clearly established the other way, that's what I was trying to say. So Billingsley, perfect example, huge distinguishing factor. In Billingsley, that officer lost sight of Mr. Billingsley, or of the decedent, as he jumped off a porch 15 feet below, and then now becomes in a crouched position where the officer can't see. In the meantime, did he access a gun, does he have a gun, and he was not wearing clothes that would have required this cumbersome movement to try to find something. Yeah, apparently all he did those rotate one shoulder, he did less than your guy. He did, but the key is the line of sight from the officer who shot was completely lost. Okay, Thompson's a fence, Thompson's even a fence case. What do you do with the Thompson case, are you familiar with it? Well, again, I think in that case it also has... Thompson versus Hubbard, 2001, go ahead. Yes, your honor, I think again the clothing is critical, and the ability to access, and the line of sight. Here, there's a spotlight on this guy. He never goes into anywhere where he could possibly produce a weapon. The chain is never broken. This officer is on him 100% of the time, so that opportunity for, oh, now he's got something, never occurs. Thompson's another shot in the back case, right? I believe it's at least one shot. Here we have three shots. Yeah, proceed. I'm sorry, your time is up. I got so involved looking down, I didn't look up. So listen, thank you very much, both of you, for your arguments. Case number 19-3230 is submitted for decision by this court.